UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SCOTT STERN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNIVERSITY OF MASSACHUSETTS AT ) | |
| AMHERST; UNIVERSITY OF ) | Civil Action No. |
| MASSACHUSETTS HEALTH SERVICES; ) | 04-30176-FDS |
| BERNADETTE MELBY, DIRECTOR OF ) | |
| HEALTH SERVICES; BRIAN BURKE, ) | |
| ASSOCIATE COUNSEL, UNIVERSITY OF ) | |
| MASSACHUSETTS AT AMHERST; ) | |
| UNIVERSITY OF MASSACHUSETTS ) | |
| BOARD OF TRUSTEES; ) | |
| MASSACHUSETTS BOARD OF HIGHER ) | |
| EDUCATION; DIVISION OF HEALTH ) | |
| CARE FINANCE AND POLICY, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**SAYLOR, J.**

Plaintiff Scott Stern, proceeding *pro se*, seeks to enroll as a part-time student at the University of Massachusetts at Amherst. The University refuses to permit him to do so because he has failed to pay a student health fee and is therefore deemed to be administratively withdrawn. Stern contends that the imposition of the fee violates federal and state law and seeks preliminary injunctive relief requiring the University to permit him to enroll without paying past or future fees. Stern also seeks a preliminary injunction requiring defendants to allow the University of Massachusetts Student Legal Services Office to represent him in this litigation.

This matter first came before the court on September 7, 2004, when Stern sought a temporary restraining order in order to permit his enrollment at the beginning of the fall semester. After a hearing, the court denied that request. The court then held a hearing on the preliminary injunction motion on September 23, 2004 and received supplemental filings from the parties. For the reasons set forth below, plaintiff's motion for preliminary injunction is likewise denied.

## I.    Factual Background

There does not appear to be a significant dispute with respect to most of the facts that are material to this motion. Those facts that are somewhat disputed are highlighted below.

Scott Stern wishes to attend the University of Massachusetts at Amherst ("UMass") on a part-time basis. In fall 2003 and spring 2004, Stern did attend UMass, enrolling in courses totaling six credits and three credits, respectively. Since at least fall 2003, Stern has received funding for his education from the Massachusetts Rehabilitation Commission because he is an individual with bipolar disorder.

UMass requires all students seeking to enroll in courses totaling more than five credits per semester to sign up for a Qualifying Student Health Insurance Plan ("QSHIP") or show proof of comparable coverage in an alternate health plan. For the fall semester of 2003, UMass charged Stern its standard QSHIP fee, which was then $705. Although there is a dispute about whether UMass removed the fee temporarily in response to complaints by Stern, it is clear that Stern never paid the fee. He nonetheless was permitted to enroll in classes through spring semester 2004.

Stern refused to pay the QSHIP fee on the grounds that UMass is prohibited by law from requiring part-time students carrying fewer than nine credits to enroll in the QSHIP. Specifically,

Stern cites Chapter 15A, Section 18 of the General Laws and Section 3.03 of Title 114.6 of the Code of Massachusetts Regulations in support of his position. Section 18 states in pertinent part:

> Every full-time and part-time student enrolled in a public or independent institution of higher learning located in the commonwealth shall participate in a qualifying student health insurance program. For purposes of this section, "part-time student" shall mean a student participating in at least seventy-five percent of the full-time curriculum.

Mass. Gen. Laws ch. 15A, § 18. Title 114.6 is to the same effect. 114.6 Code of Mass. Regs., §§ 3.02, 3.03. UMass defines a full-time student to be one enrolled in courses totaling at least twelve credits. Stern contends that only part-time students enrolled in nine credits or more (75% of the full-time curriculum) should have to pay the QSHIP fee, and that the UMass policy setting the threshold at five credits accordingly violates the statute.

On August 23, 2004, Stern received a letter from UMass notifying him that there was an outstanding balance on his account consisting, among other things, of the QSHIP fee from fall 2003.[1] Stern attempted to enroll in two courses for the fall 2004 semester, but was unable to do so because UMass deemed him administratively withdrawn for nonpayment of the outstanding balance on his account. The deadline for registering for courses during the fall 2004 semester was September 21, 2004. In addition, the Massachusetts Rehabilitation Commission informed Stern that he needed to be enrolled at UMass by that date to qualify for funding for the semester.

Upset about being charged the QSHIP fee, Stern sought assistance from the UMass Student Legal Services Office, a group that is funded, at least in part, by student fees. Individuals associated with the Student Legal Services Office informed him that they could not file suit on his

---

[1] Stern apparently also owed a library charge of $70 and a "senior graduating fee" of $110.

behalf in this matter because a policy of the UMass Board of Trustees prevents the Student Legal Services Office from engaging in litigation against the University.

## II.     Procedural Background

On September 7, 2004, Stern filed a complaint *pro se* in the United States District Court for the District of Massachusetts, Western Division. He was allowed to proceed *in forma pauperis*. The district judge in the Western Division recused himself from the matter due to a potential conflict of interest and transferred it to the Central Division.

In his complaint, Stern alleges generally that, by imposing the QSHIP fee and preventing the Student Legal Services Office from representing him, defendants have violated his rights under the United States Constitution, the Massachusetts Constitution, and various federal and state statutes and regulations.[2] Stern seeks (1) an injunction requiring defendants to remove his "administratively withdrawn" status and to permit him to enroll for the fall 2004 semester; (2) an injunction requiring defendants to permit the Student Legal Services Office to represent him; (3) a declaration that defendants' conduct violates the Massachusetts General Laws, the Massachusetts Constitution, the United States Constitution, and Title 34 of the Code of Federal Regulations; (4) a declaration that defendants' refusal to allow UMass Student Legal Services to represent him violates the Massachusetts Constitution; (5) damages; and (6) attorneys' fees and costs.

On September 7, 2004, Stern filed an Emergency Motion for Injunctive Relief to Allow Plaintiff to Enroll at the University of Massachusetts at Amherst. (Docket #4). On September

---

[2] Stern purports to bring this case as a class action, citing Fed. R. Civ. P. 23(b)(2). He defines the class as "all past, present and future University of Massachusetts part-time students, that, because of fraudulent and discriminatory activities on the part of Director of Health Services Bernadette Melby, has sought to over-charge students that classify as part-time students according to the Code of Massachusetts Regulations." Compl. ¶ 22.

14, 2004, Stern filed an Emergency Motion for Preliminary Declaratory and Injunctive Relief Ordering Defendants and Their Agents, Employees *[sic]* to Enroll Plaintiff at the University of Massachusetts at Amherst and Memorandum of Law in Support of this Emergency Motion. (Docket #7). The court treated the two together as motions for a temporary restraining order and a preliminary injunction.

On September 17, 2004, the court held a telephonic hearing on the motion for temporary restraining order. The court denied the motion, concluding that, although Stern had demonstrated a risk of irreparable harm and that the balance of the harms favored him, Stern was unlikely to succeed on the merits of his claim.[3]

On September 23, 2004, the court held a hearing on the motion for preliminary injunction. For the reasons set forth below, the motion is DENIED.

**III.    Legal Analysis**

The Court "determines whether to issue a preliminary injunction by weighing four factors: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (internal quotation omitted).

The court has considered Stern's complaint and his numerous other filings in an attempt to understand the nature and basis of his claims. *See Evicci v. Baker*, 190 F. Supp. 2d 233, 238 (D.

---

[3] On the limited record before it, the court determined that the public would not be substantially affected by denial of the motion.

Mass. 2002) (reviewing *pro se* plaintiff's complaint and associated affidavits, motions, memoranda, and letters to infer the causes of action plaintiff intended to assert). "[P]*ro se* pleadings are to be liberally construed, in favor of the *pro se* party." *Ayala Serrano v. Lebron Gonzalez*, 909 F.2d 8, 15 (1st Cir. 1990). Although the court is required to treat Stern's submissions with an extra degree of solicitude, it is not required "to conjure up unpled allegations." *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979).

### A.  Likelihood of Success on the Merits

"[L]ikelihood of success is an essential prerequisite for the issuance of a preliminary injunction." *Bl(a)ck Tea Society*, 378 F.3d at 15. If the movant cannot demonstrate that he is likely to succeed, "the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002), *quoted in Bl(a)ck Tea Society*, 378 F.3d at 15. Because Stern is unlikely to succeed on the merits, as explained in detail below, the court must deny his motion for preliminary injunction.

#### 1.  *Sovereign Immunity*

UMass contends that Stern is unlikely to succeed on the merits because the Eleventh Amendment acts as an absolute bar to all of his claims. As discussed below, the court agrees that the Eleventh Amendment bars most of those claims. Under the doctrine of *Ex Parte Young*, however, the Eleventh Amendment does not bar Stern's federal claims for prospective injunctive relief against the individual defendants, Melby and Burke, in their official capacities.

##### a.  Claims Against State Agencies

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. As interpreted, the Eleventh Amendment also bars suits brought in federal court against a state by its own citizens. *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). Thus, in the absence of consent, a federal-court suit in which the state or one of its agencies or departments is the named defendant is proscribed by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Here, Stern has named the Massachusetts Board of Higher Education and the Massachusetts Division of Health Care Finance and Policy as defendants. Both entities qualify as agencies or departments of the Commonwealth. *See* Mass. Gen. Laws ch. 15A (Board of Higher Education); Mass. Gen. Laws ch. 6A, § 16, Mass. Gen. Laws ch. 118G (Division of Health Care Finance and Policy). As there is no indication of consent to suit by the Commonwealth, Stern's claims against those agencies are barred.

      b.  **<u>Claims Against UMass</u>**

Whether UMass can invoke the protection of the Eleventh Amendment is a thornier issue.[4] Although most federal courts have permitted state universities to invoke the state's sovereign immunity to prevent litigation in federal court, *see* Erwin Chemerinsky, *Federal Jurisdiction* § 7.4 (3d ed. 1999), the First Circuit has developed a fact-intensive, multipart test for determining whether a state university is an arm of the state. *See University of R.I. v. A.W. Chesterton Co.*, 2

---

[4] Stern has named UMass, University of Massachusetts Health Services, and the University of Massachusetts Board of Trustees as defendants. It is unclear from the record whether UMass Health Services is a separate legal entity in any respect. The Board of Trustees appears to have been sued collectively, as an entity, not individually, as trustees. This court is aware of no reason to treat UMass Health Services or the Board separately from UMass itself. For the sake of convenience, the latter two entities will be included in the term "UMass."

F.3d 1200 (1st Cir. 1993) (concluding that the University of Rhode Island is *not* an arm of the state for diversity-of-citizenship purposes); *see also Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*, 991 F.2d 935 (1st Cir. 1993) (applying multifactor test in concluding that the Puerto Rico Aqueduct & Sewer Authority is not an agency of Puerto Rico entitled to Eleventh Amendment immunity).  And, while some district courts have determined that UMass (or UMass Memorial Medical Center) is an arm of the Commonwealth,[5] the First Circuit appears not to have squarely decided the issue.  *See Neo Gen Screening, Inc. v. New Eng. Newborn Screening Program*, 187 F.3d 24, 27 (1st Cir. 1999) (describing as "at least colorable and certainly not plain error" the district court's holding that UMass enjoys Eleventh Amendment immunity but not deciding the issue because it was conceded for purposes of appeal); *Cantwell v. University of Mass.*, 551 F.2d 879, 880 (1st Cir. 1977) (affirming dismissal of claims against UMass on common-law-sovereign-immunity grounds).

In *A.W. Chesterton*, the University of Rhode Island ("URI") contended that it was not a citizen of Rhode Island for diversity-of-citizenship purposes because it is an arm or alter ego of the state, and a state cannot be a citizen of itself for purposes of diversity jurisdiction.  2 F.3d at 1202.  The First Circuit ruled that "each state university must be evaluated in light of its unique characteristics," *id.* at 1204, and listed eight nonexhaustive criteria for courts to consider in making the arm-of-the-state determination:

---

[5] *See Orell v. UMass Mem'l Med. Ctr., Inc.*, 203 F. Supp. 2d 52, 60 (D. Mass. 2002) ("UMMC, as a part of the University of Massachusetts, is a public institution established under the laws of the Commonwealth and is, accordingly, an 'arm' of the state entitled to Eleventh Amendment immunity"); *Ali v. University of Mass. Med. Ctr.*, 140 F. Supp. 2d 107, 110 (D. Mass. 2001) (holding that UMMC, as a part of UMass, is an arm of the state and therefore not subject to suit under the MCRA); *Daniel v. American Bd. of Emergency Med.*, 988 F. Supp. 127, 180-81 (W.D.N.Y. 1997) (concluding that the UMass Medical Center is entitled to Eleventh Amendment immunity).

> whether the entity (1) performs an "essential" or "traditional" governmental function, as opposed to a nonessential or merely proprietary one; (2) exercises substantial autonomy over its internal operations; (3) enjoys meaningful access to, and control over, funds not appropriated from the State treasury; (4) possesses the status of a "public corporation"; (5) may sue and be sued in its own name; (6) can enter into contracts in its own name; (7) has been granted a state tax exemption on its property; or (8) has been expressly debarred from incurring debts in the State's name or behalf.

*Id.* at 1205 (citations omitted).

Applying those factors, the court concluded that the Rhode Island Board of Higher Education, the legal entity that acts for URI, "unlike more 'typical' state educational entities," was so operationally and financially autonomous that it was not an arm or alter ego of the state and therefore was a Rhode Island citizen for diversity purposes. *Id.* at 1211. The court noted that the Board enjoyed an "extraordinary measure" of autonomy. *Id.* at 1206. It had pervasive supervisory powers with significant insulation from political pressure. *Id.* at 1208. It had the power to hold, acquire, and dispose of property for URI and to enter into contracts in its own name. *Id.* at 1209. The court also concluded that the Board had significant financial autonomy from the state. *Id.* at 1211. Thus, although it received both appropriated funds and nonappropriated funds (for example, tuition and donations), it had plenary authority to reallocate appropriated funds, and a significant portion of its funds were nonappropriated. *Id.* at 1210.

The court in *A.W. Chesterton* noted that there is "an essential similarity between the [Eleventh Amendment] immunity and diversity tests." 2 F.3d at 1202 n.4. The ultimate question for decision in both contexts is "whether the [state] remains the *real party in interest*, notwithstanding [the state-related entity's] designation as the nominal [party]." *A.W. Chesterton*, 2 F.3d at 1203. Implicitly, therefore, the test announced in *A.W. Chesterton* for determining

9

whether a state university is an arm of the state for diversity purposes approximates the test for determining whether a university is an arm of the state for immunity purposes. *See Neo Gen Screening*, 187 F.3d at 27 ("The multi-part tests that we have … overlap but do not quite duplicate tests that determine whether a university is *an independent entity for purposes of diversity jurisdiction. Cf. University of Rhode Island v. A.W. Chesterton Co.*, 2 F.3d 1200, 1202-05 (1st Cir. 1993)."). In the immunity context, an additional, primary focus of attention is on "any financial *drain* on the State treasury caused by a judgment" adverse to the state-related entity. *A.W. Chesterton*, 2 F.3d at 1202 n. 4. Consequently, in order to determine whether U Mass is entitled to Eleventh Amendment immunity, the court must apply the factors set forth in *A.W. Chesterton* to the unique characteristics of UMass, focusing particularly on the financial consequences to the state treasury of a judgment against the school.

As the First Circuit has stated, "[t]he Eleventh Amendment's primary concern is to minimize federal courts' involvement in disbursal of the state fisc. . . . Generally, if a state has a legal obligation to satisfy judgments against an institution out of public coffers, the institution is protected from federal adjudication by the Eleventh Amendment." *Metcalf & Eddy, Inc.*, 991 F.2d at 939. From the court's review of applicable Massachusetts statutes and regulations,[6] it appears that any money judgment Stern might achieve against UMass ultimately would be against the Commonwealth. *See* Mass. Gen. Laws ch. 75, § 1 (defining UMass as a "public institution of higher learning"); 815 Code of Mass. Regs., § 5.02 (defining agency of Commonwealth to include

---

[6] As the Supreme Court has observed, "the question whether a particular state agency . . . is . . . an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment, is a question of federal law. But that federal question can be answered only after considering the provisions of state law that define the agency's character." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997).

"institutions of higher education"); 815 Code of Mass. Regs., §§ 5.09, 5.10 (describing process by which judgments against such agencies are processed by the Comptroller of the Commonwealth). A decision from the Western District of New York similarly concludes that the commonwealth must "pay the university's legal obligations and debts." *Daniel*, 988 F. Supp. at 180. On this "principal issue," therefore, it appears that UMass is an arm of the state for Eleventh Amendment purposes. *See Metcalf & Eddy*, 991 F.2d at 940.

Moreover, the Commonwealth exercises significant operational and financial control over UMass. *See A.W. Chesterton*, 2 F.3d at 1205. UMass is a state university created by statute. Mass. Gen. Laws ch. 75, § 1. It serves a quintessential governmental function—namely, to provide public higher education. Mass. Gen. Laws ch. 75, § 2. UMass is governed by a board of trustees, the vast majority of whom are appointed by the governor to serve five-year terms. Mass. Gen. Laws ch. 75, § 1A. The trustees manage and administer, on behalf of the Commonwealth, property used or occupied by the university. *Id.* The trustees can adopt, amend, or repeal rules and regulations for the government of UMass, but they must comply with certain provisions of the Massachusetts Administrative Procedure Act. Mass. Gen. Laws ch. 75, § 3. UMass employees are employees of the Commonwealth. Mass. Gen. Laws ch. 75, § 14.

Operating funds for UMass are appropriated by the Massachusetts legislature and administered by UMass trustees. Mass. Gen. Laws ch. 75, §§ 8, 12. The trustees must submit recommendations for tuition rates to the Board of Higher Education for approval. Mass. Gen. Laws ch. 75, § 1A. The trustees must prepare and submit a budget for the university to the governor. *Id.* All university accounts under the direction and control of the trustees are audited annually by the state auditor. Mass. Gen. Laws ch. 75, § 6. Monthly statements of the receipts

and expenditures of UMass must be made to the state comptroller, and a complete financial report covering all receipts and expenditures is given annually to the governor and the legislature. Mass. Gen. Laws ch. 75, § 10. The purchasing power of the trustees is limited by Mass. Gen. Laws ch. 75, § 13. The Commonwealth must indemnify trustees against liability arising out of their official duties performed in good faith and without malice. Mass. Gen. Laws ch. 75, § 1A.

Based on those factors, among others, every federal court to decide the issue has concluded that UMass is entitled to Eleventh Amendment immunity. *See Orell,* 203 F. Supp. 2d at 60; *Ali*, 140 F. Supp. 2d at 110; *Daniel*, 988 F. Supp. at 180-81. Decisions of the Massachusetts courts also treat UMass as an arm of the Commonwealth. *E.g.*, *Wong v. University of Massachusetts*, 438 Mass. 29 (2002); *McNamara v. Honeyman*, 406 Mass. 43 (1989); *Hannigan v. New Gamma-Delta Chapter of Kappa Sigma Fraternity, Inc.*, 367 Mass. 658 (1975)*; Robinson v. Commonwealth*, 32 Mass. App. Ct. 6 (1992). These Massachusetts decisions are entitled to "great deference." *A.W. Chesterton*, 2 F.3d at 1205 n.8.

This court likewise concludes that UMass is an arm of the state for Eleventh Amendment purposes. Consequently, Stern's claims against the University of Massachusetts at Amherst, University of Massachusetts Health Services, and the University of Massachusetts Board of Trustees are barred by reason of sovereign immunity.

c.      **Supplemental State Claims**

Stern also brings various state claims seeking to force the Commonwealth or its officials to comply with state law.[7]  This court, by operation of the Eleventh Amendment, lacks the power to decide any of Stern's state-law claims.  *See Pennhurst*, 465 U.S. at 119, 121 (holding that the Eleventh Amendment "deprives a federal court of power to decide" claims that state officials violated state law in carrying out their official responsibilities, even when brought into federal court under pendent jurisdiction).

### d. Claims Against Melby and Burke

Even though UMass itself is immune from suit in federal court, Stern may properly assert claims against the individually named defendants, Melby and Burke, in their official capacities, for prospective injunctive relief for violations of federal law under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908).  *See Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002).  That distinction ultimately is hollow in this case, however, because, as explained below, Stern's federal claims lack merit and therefore do not support the issuance of a preliminary injunction.

---

[7] As noted, Mass. Gen. Laws ch. 15A, § 18 requires all part-time students enrolled in at least 75% of the full-time curriculum to participate in the QSHIP program.  Stern's principal state-law theory is that § 18 prevents UMass from implementing a more comprehensive program that includes more part-time students.  The court notes that there is no direct prohibition in § 18 against imposing a fee against students enrolled in less than 75% of the full-time curriculum, and other statutes grant broad powers to UMass to set fees.  *See, e.g.*, Mass. Gen. Laws ch. 75, §§ 1, 1A, 2, 3 (conferring broad authority on the UMass Board of Trustees to establish fees, set policies, and adopt rules and regulations for the operation of the university).  Nonetheless, because of the court's disposition of Stern's motion on Eleventh Amendment and federal-law grounds, the court does not decide the merits of his state-law claims.

### 2.     *Merits of the Federal-Law Claims*

As noted above, Stern's claim is based on two prongs: (1) UMass charged him the QSHIP fee when he enrolled for fewer than nine credits, and (2) UMass prohibited the Student Legal Services Office from representing him in this litigation.  The court has carefully read Stern's complaint, his motions for temporary restraining order and preliminary injunction, and the affidavits and exhibits he has submitted in support of those motions.  Stern claims that defendants have violated his rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and made actionable by 42 U.S.C. § 1983.[8]  The court infers that Stern is attempting to assert equal-protection and substantive-due-process claims for interference with his "right to education," as guaranteed by the Fourteenth Amendment, and his "right to counsel," as guaranteed by the Fifth and Sixth Amendments and applied to the states by the Fourteenth Amendment.

#### a.     **Right to Education**

As explained above, Stern appears to claim that UMass's QSHIP fee policy (at least as applied to him) violates constitutional guarantees of equal protection and substantive due process.  Stern has by no means precisely articulated the contours of those claims.  Because the legal standard this court would apply is essentially the same on either an equal protection or a

---

[8] Stern also cites 42 U.S.C. §§ 1981, 1982, 1985, 1986, and 1988 as providing him with additional sources of substantive rights or causes of action.  These statutes appear not to apply to this matter as they deal, collectively, with race-based discrimination, conspiracies to violate civil rights, and the awarding of attorney's fees. Additionally, Stern makes a passing reference to Title 34 of the Code of Federal Regulations, which, in general, applies to federally funded education programs.  Reading the complaint in its entirety, Stern's reference to Title 34 appears to be merely a further underpinning for his constitutional right-to-education and disability-discrimination theories, which, in addition to his right-to-counsel theory, comprise the essence of his federal claims.

substantive due process theory, the court will analyze Stern's claims in terms of equal protection. *See Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 46 (1st Cir. 2003).

Equal-protection challenges are evaluated according to one of three standards. A state enactment will be subjected to strict scrutiny if it burdens a fundamental right, such as the right to vote, or creates a distinction based on a suspect classification, such as race. A reviewing court will uphold such a measure only if the state can clearly demonstrate a compelling interest that cannot be served by less intrusive means. *Id.* at 47. Other classifications, such as those based on illegitimacy, receive intermediate scrutiny and will be upheld if the state demonstrates that they are substantially related to an important government objective. *Id.* All other legislative enactments receive only rational-basis review; they will be upheld so long as the means are rationally related to a legitimate government purpose. *Id.*

Stern contends that UMass's QSHIP policy infringes on his "right to education." There is not, however, a general federal constitutional right to education. *See Rodriguez v. San Antonio Sch. Dist.*, 411 U.S. 1, 35 (1973).

Stern further argues that, because he is an individual with a disability who receives funding from a state agency that in turn receives federal funding, the QSHIP policy violates his equal-protection rights as an individual with a disability. To prove an equal-protection claim, plaintiff must demonstrate that the defendant acted with discriminatory intent or purpose. *See Washington v. Davis*, 426 U.S. 229, 239-42 (1976). This requirement "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not in spite of, its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979).

In this case, Stern has not established – or even pleaded – any facts to indicate that UMass discriminated against him because of his disability in imposing the QSHIP fee. Stern himself acknowledged that UMass charges the QSHIP fee to *all* part-time students enrolled in five credits or more – disabled and non-disabled students alike. At most, Stern has alleged that UMass continued to insist that he pay the QSHIP fee despite his disability. Although federal law in certain circumstances might protect Stern from being treated differently from non-disabled students because of his disability, Stern has provided the court with no authority that suggests that his disabled status exempts him from policies UMass applies to all of its students.

Moreover, classifications based on disability, even when they do exist, trigger only rational-basis review. *See Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985). As such, and because Stern has no fundamental right to education, the challenged QSHIP policy need only be rationally related to a legitimate state interest to survive federal constitutional scrutiny. *See Kittery Motorcycle, Inc.*, 320 F.3d at 47. UMass maintains that its QSHIP policy is designed to reduce its students' utilization of the uncompensated care pool. Massachusetts clearly has a fiscal interest in reducing the burden on that pool. That interest is directly furthered by ensuring that fewer UMass students are uninsured and therefore likely to utilize the resources of the pool. That UMass set the threshold for participation in the QSHIP program at five credits versus some other number is of no consequence. UMass reasonably could conclude that students enrolling in five credits or more are less likely to have satisfactory coverage than students enrolling in fewer credits and therefore should automatically be enrolled in the program pending their affirmative waiver.

The court concludes that the QSHIP fee policy does not violate Stern's rights under the Fourteenth Amendment. Consequently, he is unlikely to succeed on the merits of those claims.

### b.     Right to Counsel

The court interprets Stern's references to the Fifth and Sixth Amendments as raising a constitutional right-to-counsel claim arising out of UMass's policy prohibiting the Student Legal Services Office from engaging in litigation. Specifically, Stern maintains that he has a federal constitutional right to have the Student Legal Services Office represent him in this dispute. As an initial matter, there is no federal constitutional right to counsel in civil cases. *King v. Greenblatt*, 149 F.3d 9, 14 (1st Cir. 1998). The exception for civil cases where the unrepresented litigant risks loss of physical liberty, *see Lassiter v. Department of Social Servs.*, 452 U.S. 18, 27 (1981), does not apply here.

Although a civil litigant does have a due-process right to retain *hired* counsel in a civil case, *see Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 257 (1st Cir. 1986), UMass is not required to *provide* Stern's legal representation. Indeed, in *Student Gov't Ass'n v. Board of Tr. of the Univ. of Mass.*, 868 F.2d 473 (1st Cir. 1989), the First Circuit upheld the very policy Stern challenges here. There, the court explained that student-activity fees belong to the university, not to students, and the university can constitutionally refuse to pay for the litigation expenses of its students. *Student Gov't Ass'n*, 868 F.2d at 478-79. Stern very well may not be able to hire his own counsel in this matter, but that condition is not of UMass's making, and UMass is under no obligation to remove an obstacle it did not create. *See id.* at 479. Consequently, Stern is unlikely to succeed on his right-to-counsel claim.

### B. Irreparable Harm

Without the preliminary injunction Stern seeks, Stern will not be permitted to enroll in courses at UMass during the fall semester of 2004 if he does not pay the outstanding balance on his account. It is very likely that this will result in an interruption of Stern's education. Stern has also established that he may lose funding from the Massachusetts Rehabilitation Commission for the fall 2004 semester. The court has no trouble concluding, and UMass does not contest, that Stern risks irreparable harm if UMass is not enjoined.

### C. Balance of Harms

As noted, Stern risks irreparable harm should he not be permitted to enroll in courses at UMass. UMass, by contrast, has not identified any harm that it would suffer. Therefore, the court concludes that the balance of harms favors Stern.

### D. Public Interest

On the limited record before it, the court determines that the public would not be substantially affected by the denial of the injunction in this essentially private dispute.

### III. Conclusion

For the reasons stated above, the court concludes that Stern is unlikely to succeed on the merits of his claims. The motion for preliminary injunction is therefore DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: October 15, 2004