UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| Scott Stern,<br>400 West Main Street<br>North Adams, MA. 01247,<br>and other persons similarly situated in the Commonwealth of Massachusetts; and other persons similarly situated in the United States of America; and other persons similarly situated not currently residing within the Commonwealth of Massachusetts or the United States of America,<br><br>    Plaintiff,<br>vs.<br><br>University of Massachusetts at Amherst<br>University Health Services<br>Director of Health Services,<br>Bernette Melby<br>150 Infirmary Way<br>Amherst, Massachusetts.  01003,<br>Defendant<br><br>and,<br><br>University of Massachusetts at Amherst<br>Brian Burke, Associate Counsel<br>300 Whitmore Administration Building<br>Amherst, Massachusetts  01003<br>Defendant<br><br>and,<br><br>Massachusetts Board of Trustees,<br>One Beacon Street<br>26th Floor<br>Boston, Massachusetts  02108<br>Defendant<br><br>and, | Case No.: 04-30176-MAP<br><br>CONSOLIDATED COMPLAINT OF ALL AMENDMENTS PER ORDER OF THE UNITED STATES DISTRICT COURT INCLUDING THE FOLLOWING AMENDMENTS:<br><br>MOTIONS TO AMEND COMPLAINT OF SEPTEMBER 6th, 2004<br><br>MOTION TO MODIFY NAMED DEFENDANTS IN COMPLAINT OF SEPTEMBER 6th, 2004 |

Massachusetts Board of
Higher Education
One Ashburton Place
Room 1401
Boston, Massachusetts 02108-1696
Defendant

and,

Division of Health Care
Finance and Policy
It's EMPLOYEE "MR GETACHEW" and not
the DIVISON IN ITS ENTIRETY.
Two Boylston Street
Boston, Massachusetts 02116-4737

NOW HERE COMES PLAINTIFF AND MOVES this court to allow plaintiff to modify his submitted complaint by removing the Division of Health Care Finance and Policy as a named defendant and substituting and replacing the named defendant with the person named "Mr Getachew" or someone that is similarly named that is employed at the Division of Health Care Finance and Policy that responded to telephone Calls conducted by law clerk Suman Rastogi in an investigation of the QSHIP program and policies of the Student Legal Services Office.

NOW HERE COMES PLAINTIFF AND MOVES this court to allow the original complaint, amendments to the complaint, Memorandum of Law, and affidavits which may be already submitted to this court to be modified by removing all references to "Bernadette Melby" and replacing this defendant with the name "Bernette Melby."

NOW HERE COMES PLAINTIFF AND MOVES this court to allow the Original complaint and the Memorandum of Law, to herein name and Incorporate the following companies as Co-Defendants in the above Captioned matter. The following company that first needs to be

Incorporated as a CO-DEFENDANT is: The Chickering Group, An AETNA Company, P.O. Box 15708, Boston, Massachusetts 02215, and inclusive of this company the following Management Team: Daniel Fishbein, M.D. President; Paul Silva, Chief Operating Officer; Frederick H. Chicos, Chairman Emeritus; Kenneth D. Chicos, Vice-Chairman, Emeritus; Stephen Caulfield, Chairman; Paul Cronin, Senior Vice-President, Actuarial and Underwriting Services; Mark C. Kelley, Senior Vice President, Operations; Scott A. Champagne, Senior Vice President, Client Services; Gary W. Nicksa, Senior Vice President, Finance & Administration; Dale Grenolds, Vice President, Business Development; Judith M. Marie, Esq., Vice President, Human Resources; Maryellen Pease, Vice President of Finance; Linda M. Ragosta, Ed.D., Vice President for Institutional Relations.

NOW HERE COMES PLAINTIFF AND MOVES this court to amend the Complaint and memorandum of law in support of the complaint and modify the following company as a CO-DEFENDANT in the above referenced file. The company plaintiff requests to name as a co-defendant is AETNA LIFE INSURANCE COMPANY, 151 Farmington Avenue, Hartford, Connecticut, 06156 A company with principal offices in Connecticut but with its incorporation residing in Pennsylvania. Plaintiff herein names the following Officers and Management of "Aetna Insurance Company"/"Aetna Inc /PA/"; "Aetna Inc."; "Aetna Inc /CT/; and any other names the company "AETNA" may employ under subsidiaries that attempt to hide the true ownership of The Chickering Group of Boston, Massachusetts as Co-Defendants of the above referenced action; "Aetna" has used the legal

system and the rules of court to avoid being responsible for actions its other subsidiaries have committed in the past and it will, nevertheless, attempt to do the same with the actions of The Chickering Group.

The parties herein are the management of "Aetna":

John Rowe, M.D. Chairman and Chief Executive Officer; Ronald Williams, President; Edward L. Shaw, Executive Vice President and General Counsel; David B. Kelso, Former Executive Vice President Strategy and Finance; Timothy A. Holt, Senior Vice President and Chief Investment Officer; Alan M. Bennett, Senior Vice President and Chief Financial Officer.

Plaintiff may need to modify this list of defendants, by deleting, adding or including other individuals that may have conspired to defraud the class members and the citizens of the Commonwealth of Massachusetts by means of forcibly charging for health insurance premiums under a student health insurance program, issued by one of their subsidiaries, "CHICKERING" that were in direct violation of the Massachusetts General Laws, Code of Massachusetts Regulations and the Guidelines established by the Division of Health Care Finance and Policy.

AETNA INSURANCE COMPANY HAS CLASS ACTION LAWSUITS PENDING IN OTHER STATES AT THIS TIME AND THIS COMES FROM THEIR 2004 FILING WITH the Securities and Exchange Commission and this 2004 quarterly report ending the quarter dated March 31, 2004 can be found at the below weblink.

Just copy and paste into one's address bar:

http://sec.freeedgar.com/displayHTML.asp?ID=2927002

Item 1. Legal Proceedings

*Managed Care Class Action Litigation*

Since 1999, the Company has been involved in purported class action lawsuits that are part of a wave of similar actions targeting the health care payor industry and, in particular, the conduct of business by managed care companies (the "Managed Care Class Action Litigation").

The Judicial Panel on Multi-district Litigation transferred all of the federal actions, including several actions originally filed in state courts, to the United States District Court for the Southern District of Florida (the "Florida Federal Court") for consolidated pretrial proceedings. The Florida Federal Court created a separate track for all cases brought on behalf of health care providers (the "Provider Cases").

Thirteen Provider Cases were presided over by the Florida Federal Court, and a similar action is pending in Louisiana state court, on behalf of purported classes of physicians. These Provider Cases alleged generally that the Company and each of the other defendant managed care organizations employed coercive economic power to force physicians to enter into economically unfavorable contracts, imposed unnecessary administrative burdens on providers and improperly denied claims in whole or in part, and that the defendants did not pay claims timely or did not pay claims at proper rates. These Provider Cases further charged that the Company and the other defendant managed care organizations conspired and aided and abetted one another in the alleged wrongdoing. These actions alleged violations of the Racketeer Influenced and Corrupt Organizations Act, the Employee Retirement Income Security Act of 1974, state unfair trade statutes, state consumer fraud statutes, state laws regarding the timely payment of claims, and various common law doctrines and sought various forms of relief, including unspecified damages, treble damages, punitive damages and injunctive relief.

Effective May 21, 2003, the Company and representatives of over 900,000 physicians, state and other medical societies entered into an agreement (the "Physician Settlement Agreement") settling the lead physician Provider Case pending in the Florida Federal Court. The Physician Settlement Agreement was approved by the Florida Federal Court on November 6, 2003. The order of approval has been appealed to the United States Court of Appeals for the Eleventh Circuit, and the appeal is scheduled to be argued on August 12, 2004. The Company anticipates that, if the approval order is not overturned on appeal, the Physician Settlement Agreement will resolve all pending Provider Cases filed on behalf of physicians that did not opt out of the settlement, including the Louisiana state court action. During the second quarter of 2003, the Company recorded an after-tax charge of $75 million ($115 million pretax) (included in other operating expenses) in connection with the Physician Settlement Agreement, net of an estimated insurance recoverable of $72 million pretax.

A Provider Case brought on behalf of the American Dental Association makes similar allegations on behalf of a purported class of dentists. Effective August 22, 2003 the Company and representatives of approximately 150,000 dentists entered into an agreement (the "Dentist Settlement Agreement") settling the dentist action. The Dentist Settlement Agreement was preliminarily approved by the Florida Federal Court on April 21, 2004. If finally approved by the Florida Federal Court, the Company anticipates that the Dentist Settlement Agreement would result in the conclusion of all pending Provider Cases filed on behalf of dentists that do not opt out of the settlement. The final approval hearing currently is scheduled for July 20, 2004. The cost of this settlement was not material to the Company.

Three Provider Cases filed in May and June, 2003 on behalf of purported classes of chiropractors and/or all non-physician health care providers also make factual and legal allegations similar to those contained in the other Provider Cases. These Provider Cases have been transferred to the Florida Federal Court for consolidated pretrial proceedings. The Company intends to defend each of these new Provider Cases vigorously.

*Securities Class Action Litigation*

Laborers Tri-County Pension Fund, Goldplate Investment Partners Ltd. and Sheila Shafran filed a consolidated and amended purported class action complaint (the "Securities Complaint") on June 7, 2002 in the United States District Court for the Southern District of New York (the "New York Federal Court"). The Securities Complaint supplanted several complaints, filed beginning November 6, 2001, which have been voluntarily dismissed or consolidated. Plaintiffs contend that the Company and two of its current or former officers and directors, William H. Donaldson and John W. Rowe, M.D., violated federal securities laws. Plaintiffs allege misrepresentations and omissions regarding, among other things, the Company's ability to manage and control medical costs and the appropriate reserve for medical costs as of December 31, 2000, for which they seek unspecified damages, among other remedies. On October 15, 2002, the New York Federal Court heard argument on defendants' motion to dismiss the Securities Complaint. Defendants intend to continue vigorously defending this action, which is in its preliminary stages.

The Company is unable to predict at this time the ultimate outcome of the Managed Care Class Action Litigation or Securities Class Action Litigation. It is reasonably possible that their outcome, including any negotiated resolution, could be material to the Company. However, as noted above, if the Florida Federal Court's approval of the Physician Settlement is ultimately affirmed, the Company anticipates that the Physician Settlement Agreement would result in the conclusion of substantially all pending Provider Cases filed on behalf of physicians.

*Other Litigation and Regulatory Proceedings*

The Company is involved in numerous other lawsuits arising, for the most part, in the ordinary course of its business operations, including employment litigation and claims of bad faith, medical malpractice, non-compliance with state regulatory regimes, marketing misconduct, failure to timely pay medical claims, investing activities, intellectual property and other litigation in its Health Care and Group Insurance businesses. Some of these other lawsuits are or are purported to be class actions.

In addition, the Company's current and past business practices are subject to review by various state insurance and health care regulatory authorities and other state and federal authorities. There continues to be heightened review by these authorities of the managed health care industry's business practices, including utilization management, delegated arrangements and claim payment practices. As a leading national managed care organization, the Company regularly is the subject of such reviews. These reviews may result in changes to or clarifications of the Company's business practices, and may result in fines, penalties or other sanctions.

While the ultimate outcome of this other litigation and these regulatory proceedings cannot be determined at this time, after consideration of the defenses available to the Company, applicable insurance coverage and any related reserves established, they are not expected to result in liability for amounts material to the financial condition of the Company, although they may adversely affect results of operations in future periods.

These two companies are in the business of marketing products and services relative to students and the student health insurance market. The first company "The Chickering Group" has had agreements with the second company "Aetna" for five years. Aetna recently purchased the Chickering group and is sole owner of this company. "Currently, only two (2) million of the nation's 14.5 million college students get their coverage from school-sponsored student health plans. We believe this represents an excellent growth opportunity for Aetna in the future." This quote is from John W. Rowe Chief Executive Officer and can be found at www.insurance-portal.com/121803.htm. Certainly they have a right to offer, solicit and sell their products to the student market. What they don't have a right to do, is to convince institutions such as the University of Massachusetts at Amherst Health Services to violate the rights of students and their choice of decisions by forcing the purchase and sale of products and services upon a student population. What the Defendants herein listed have done, is conspire to defraud

students with respect to mandating health insurance in the Commonwealth of Massachusetts through the University of Massachusetts Health Services at Amherst and other institutions when the law clearly set minimums and guidelines.

The conduct of these defendants has been, and continues to be morally repugnant against the citizens of the Commonwealth of Massachusetts, the class members and in violation of the RICO and ERISA acts. What plaintiff brings to the forefront in this lawsuit is only a tip of the iceberg, this court has a responsibility to act in a manner consistent with Federal and State laws and the citizens, the class members, deserve the opportunity to be heard, and the matter investigated. It is consistent with this thought that this court issue a Temporary Restraining Order against the Defendant University of Massachusetts at Amherst Health Servies and their employees.

This question plaintiff brings to light is a question only a United States District Court can have jurisdiction over considering the Defendants are within, and outside of the Commonwealth of Massachusetts.

The actions of the newly named defendants in conspiring to defraud the students and the citizens of the Commonwealth of Massachusetts demands an investigation by the United States District Attorney's Office.

Wherefore, in consideration of this newly discovered information, plaintiff prays this court will allow this motion to amend the named defendants of the complaint of September 6, 2004.

Respectfully submitted this 27th day of September, 2004 by facsimile transmission, per permission of the court, Judge Saylor presiding, at oral argument of September 23th, 2004.

—

PLAINTIFF MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY DECLARATORY MANDATORY INJUCTION AGAINST THE DEFENDANTS.

NOW HERE COMES PLAINTIFF AND MOVES this court to AMEND the complaint of September 6, 2004 in the following manner. Plaintiff hereby incorporates the allegations contained in the first, original complaint, enumerated one (1) through fifty-five (55) dated September 6, 2004, the Motion to Amend the Complaint of September 6, 2004 dated September 27, 2004, enumerated one (1) through fifteen (15) as though fully set forth herein.

Preliminary Statement

Plaintiff alleges that the University of Massachusetts Health Services, Bernette Melby, Director and Associate Counsel, Brian Burke, the Massachusetts Board of Trustees et al. have discriminated against plaintiff, based on 42 U.S.C. 1980, 1981, 1982, 1983, 1985, 1986, 1988. Plaintiff hereby, attests and declares, that his rights have also been violated under Section 504 of the Rehabilitation Act of 1973, 42 U.S.C. 794 (a) ("Section 504") Defendant has submitted opposition requesting denial of plaintiff's motion for a Temporary Restraining Order against the defendants.

Defendants have moved for dismissal arguing that the University (Commonwealth of Massachusetts) did not give its consent to be sued in this action and that this court lacks jurisdiction over plaintiff's claims against the University.

1) Defendants motion must fail. The Eleventh Amendment does not bar Plaintiff's claims under Section 504 because defendant has waived its Sovereign immunity by accepting federal funds. As demonstrated below, Pursuant to the Spending Clause,

2) Congress validly conditioned receipt of federal financial assistance on waiver of States immunity to private suits brought to enforce Section 504. 42 U.S.C. 2000d-7. By enacting Section 2000d-7, Congress put state agencies on clear notice that acceptance of federal financial assistance was conditioned on a waiver of their Eleventh Amendment immunity to discrimination suits under Section 504. In accepting federal funds, defendant agreed to these terms. As the Eleventh Circuit recognized in Sandoval v. Hagan, 197 F. 3d 484(11th Cir. 1999) rev'd on other grounds, Alexander v Sandoval, 532 U.S. 275, Section 2000d-7 is a valid exercise of the Spending Clause, and by accepting federal funds, a State waives its sovereign immunity.

II. ARGUMENT

CONGRESS VALIDLY CONDITIONED FEDERAL FUNDING ON A WAIVER
OF ELEVENTH AMENDMENT IMMUNITY FOR PRIVATE CLAIMS UNDER SECTION 504
OF THE REHABILITATION ACT OF 1973

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794(a), prohibits discrimination against persons with disabilities under "any program or activity receiving Federal financial assistance."

3) Section 2000d-7 of Title 42 provides that a "State shall not be immune under the Eleventh Amendment of the Constitution of the United

States from suit in Federal Court for a violation of Section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of 1972 [and] title VI of the Civil Rights Act of 1964.

Section 2000d-7 may be upheld as a valid exercise of Congress's power under the Spending Clause, Art. I, §8, Cl. 1, to prescribe conditions for state agencies that voluntarily accept federal financial assistance. States are free to waive their Eleventh Amendment immunity. See College Sav. Bank v. Florida Prepaid Postsec. Educ. Expense Bd., 527 U.S. 666, 674 (1999). And "Congress may, in the exercise of its spending power, condition its grant of funds to the states upon their taking certain actions that Congress could not require them to take, and ***acceptance of the funds entails an agreement to the actions." Id. at 686. Thus, Congress, may, and has, conditioned the receipt of federal funds on defendant's waiver of Eleventh Amendment immunity to Section 504 claims.

In Rosie D., by her parents, v. Jane Swift, Acting Governor 01-1604, 1st Circuit (2001) the court, Judge Michael Ponsor, held that:

"On appeal to the 1st circuit, the court held that the 11th Amendment does not preclude the maintenance of this action. Specifically, the First Circuit stated that "while recent Supreme Court decisions have made some inroads on the venerable doctrine of Ex Parte Young, it has not eviscerated that doctrine, and only very narrow exceptions infringe on the well established right to ask for prospective injunctive relief against state officials in a federal forum."

Judge Ponsor also stated:

"We note, too, that our holding today aligns us with a broad coalition of other courts, which, subsequent to Seminole Tribe, have rejected similar arguments aimed at barring suits for prospective

injunctive relief commenced by Medicaid beneficiaries against state actors" See e.g. Frazier v. Gilbert, 300 F. 2d. 530, 550-1 & n.109 (5th Circuit 2002)

This holding is consistent with the Court's holding in Ex parte Young which Judge Ponsor stated as such:

"We need go no further. To recapitulate, we conclude that in determining whether a statute's remedial provisions preclude prospective injunctive relief under the doctrine of Ex parte Young, the proper test involves an inquiry into Congress' intent. Here, that inquiry centers on whether the remedial scheme is sufficiently comprehensive to indicate that Congress intended to foreclose such relief"

Judge Ponsor further concluded that:

"We conclude therefore, that the buckler of Eleventh Amendment immunity does not protect state officials from federal court suits for prospective injunctive relief [under the Medicaid act]"

### Section 2000d-7 IS A CLEAR STATEMENT THAT ACCEPTING FEDERAL FINANCIAL ASSISTANCE WOULD CONSTITUTE A WAIVER TO PRIVATE SUITS BROUGHT UNDER SECTION 504

It is settled in the Eleventh Circuit that Section 2000d-7 is a clear statement that in accepting federal funds, the State of Alabama is subject to suits in Federal Courts brought under Section 504. Sandoval, 197 F.3d 484, at 493-94

4) The Eleventh Circuit explained in Sandoval that "[t]he provision's plain language manifests an unmistakable intent to condition federal funds on a state's waiver of sovereign immunity." Sandoval, 197 F.3d at

493. A history of Section 2000d-7 lends context to the Court's decision.

In Garrett v. Board of Trustees of the University of Alabama in Birmingham, 97-AR-0092-S, the court disagreed with the 2nd Circuit's interpretation in Garcia v. Suny Health Sciences Center, 280 F.3d 98, 113 (2d Cir.2001) The court held in Garrett:

"It is wrong because it ignores what every state agency did know from the plain text of Section 2000d-7 since it was enacted in 1986, that acceptance of federal funds constituted a waiver of immunity to suit for violations of Section 504. Section 504 was not amended or altered by the enactment of Title I of the ADA in 1990, and it was clear that plaintiff could sue under either statute" See 42 U.S.C. 12201(b) of the Americans with Disabilities Act (preserving existing causes of action)"

The court further stated:

"It is thus untenable to suggest that abrogation for suits under one statute is relevant to whether an entity waived its immunity to suits brought to enforce a distinct, albeit substantively similar, statute"

### CONGRESS HAS AUTHORITY TO CONDITION THE RECEIPT OF FEDERAL ASSISTANCE ON THE STATE WAIVING ITS ELEVENTH AMENDMENT IMMUNITY

Congress may condition its spending on a waiver of Eleventh Amendment immunity. Indeed in Alden v. Maine, 527 U.S.706, 755 (1999), the Court cited South Dakota v. Dole, 483 U.S. 203 (1987), a case involving Congress's Spending Clause authority, when it noted that "the Federal Government [does not] lack the authority or means to seek the States' voluntary consent to private suits" Similarly, in Florida Prepaid the Court reaffirmed the holding of Petty v. Tennessee-Missouri

Bridge Commission, 359 U.S. 275 (1959), where the Court held that Congress could condition the exercise of one of its Article I powers (there, the approval of interstate compacts) on the States' agreement to waive Eleventh Amendment immunity from suit. Florida Prepaid, 527 U.S. at 686. At the same time, the Court suggested that Congress had the authority under the Spending Clause to condition the receipt of federal funds on the waiver of immunity.

Defendant asserts the suit against the university is considered "one in the same" as if it were brought against the Commonwealth of Massachusetts, citing Hannigan v. New Gamma-Delta-Chapter of Kappa Sigma Fraternity, Inc. 367 Mass. 658 (1975). Thus claiming that the action plaintiff seeks is also against the Commonwealth of Massachusetts.

The Commonwealth of Massachusetts receives various forms of monetary assistance from the federal government. The University of Massachusetts receives monetary assistance from the federal government. In so doing, each, individually or collectively, have received federal funds, and have waived their right to claim Eleventh Amendment immunity and sovereign immunity. Defendants Opposition to the Temporary Order must fail and this suit must proceed accordingly.

UMass announces new $1 million fund to develop strategic technology alliances 02/04/2004

> NEW BEDFORD - University of Massachusetts Interim President Jack M. Wilson today announced the creation of a $1 million Science and Technology Initiatives Fund designed to assist the University's five campuses in developing strategic alliances to pursue major new external funding opportunities.
>
> ''This new investment will strengthen the University's position as it competes to bring federal and other external research funds to every region of the Commonwealth,'' Dr. Wilson said today at the University of Massachusetts Board of Trustees meeting at the UMass Dartmouth College of Visual and Performing Arts in New Bedford. ''There are important new initiatives in life sciences, nanotechnology and homeland security and we must be bold in our pursuit of these opportunities for the good of the University and the Commonwealth.''
>
> The new initiative, supported from the President's Office share of the University's Commercial Ventures and Intellectual Property