## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

SCOTT STERN,

        Plaintiff,

    v.

UNIVERSITY OF MASSACHUSETTS AT
AMHERST; UNIVERSITY OF
MASSACHUSETTS HEALTH SERVICES;
BERNETTE MELBY, DIRECTOR OF
HEALTH SERVICES; BRIAN BURKE,
ASSOCIATE COUNSEL, UNIVERSITY OF
MASSACHUSETTS AT AMHERST;
UNIVERSITY OF MASSACHUSETTS
BOARD OF TRUSTEES;
MASSACHUSETTS BOARD OF HIGHER
EDUCATION; and MASSACHUSETTS
DIVISION OF HEALTH CARE FINANCE
AND POLICY,

        Defendants.

———————————————————————

Civil Action No.
04-30176-FDS

### MEMORANDUM AND ORDER ON
### DEFENDANTS' MOTION TO DISMISS

**SAYLOR, J.**

    This is a civil action arising from Scott Stern's unsuccessful attempt to enroll as a part-time student at the University of Massachusetts at Amherst. The University refuses to permit him to do so because he has failed to pay a mandatory student health fee and is therefore deemed to be "administratively withdrawn." Stern, proceeding *pro se*, contends that the imposition of the fee violates federal and state law, and seeks damages and declaratory and injunctive relief.

    Currently before the Court are two motions to dismiss; one filed by defendants University of Massachusetts, University of Massachusetts Health Services, University of Massachusetts

Board of Trustees, Director of Health Services Bernette Melby, and Associate General Counsel Brian Burke, and another filed by defendants Massachusetts Board of Higher Education and Massachusetts Division of Health Care Finance and Policy. Also pending before the Court are four motions filed by Stern that in name or in substance seek to further amend the complaint.

## **Factual Background**

As required in this context, all well-pleaded factual allegations of the amended complaint are accepted as true and will be construed in the light most favorable to the non-moving party. *See, e.g.*, *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir. 1998).[1]

The University of Massachusetts is a public university with multiple campuses, including a flagship campus at Amherst. Scott Stern, a North Adams resident, enrolled in two courses at the University of Massachusetts at Amherst during fall 2003. Those two courses amounted to six credits. The University considers all students enrolled in twelve or more credits to be full-time students.

The University of Massachusetts Health Services requires all part-time students enrolled in five or more credits to sign up for a Qualifying Student Health Insurance Plan ("QSHIP"). During the fall of 2003, the QSHIP fee at the University of Massachusetts at Amherst was $705. Stern maintains that this policy results in the overcharging of part-time students enrolled in five to

---

[1] Because Stern is proceeding *pro se*, the Court has reviewed all the filings in the record in order to understand the nature of his claims. *See Evicci v. Baker*, 190 F. Supp. 2d 233, 238 (D. Mass. 2002) (reviewing *pro se* plaintiff's complaint and associated affidavits, motions, memoranda, and letters to infer the causes of action plaintiff intended to assert). For present purposes, the Court will also accept as true various allegations set forth in filings other than the amended complaint, some of which are set forth herein.

eight credits at the University because state law does not require those students to participate in QSHIP.[2]

Stern is an individual with a bipolar disorder, a form of mental disability. He received educational funding during fall 2003 through the Massachusetts Rehabilitation Commission, which administers federal grant funds. There is nothing in the record to suggest that Stern's disability is connected to this dispute, except insofar as his inability to enroll at the University caused him to lose educational funding for that semester. In particular, Stern does not allege that he desires to use the University Health Services for treatment of his disability and that he cannot do so because of the imposition of the fee. To the contrary, it appears that Stern simply does not want to pay the fee and has no interest in using the University Health Services.

Stern was informed during fall 2003 that he was required to pay the QSHIP fee or face withdrawal from the University. According to Stern, defendant Bernette Melby, Director of Health Services, is responsible for enforcing state regulations regarding health insurance for University students.[3] Stern met with Melby to dispute the imposition of the QSHIP fee on grounds that students enrolled in fewer than nine credits are not required to sign up for QSHIP under state law, notwithstanding University policy. According to Stern, during their meeting

---

[2] Mass. Gen. Laws ch. 15A, § 18 requires all part-time students enrolled in at least 75% of the full-time curriculum to participate in the QSHIP program. In the case of UMass, 75% of the full-time curriculum is nine credits. Stern's principal state-law theory is that § 18 prevents the University from implementing a more comprehensive program that includes more part-time students. There is no direct prohibition in § 18 against imposing a fee against students enrolled in less than 75% of the full-time curriculum, and other statutes grant broad powers to the University to set fees. *See, e.g.*, Mass. Gen. Laws ch. 75, §§ 1, 1A, 2, 3 (conferring broad authority on the University of Massachusetts Board of Trustees to establish fees, set policies, and adopt rules and regulations for the operation of the university).

[3] Stern erroneously named "Bernadette," not Bernette, Melby in his original complaint. The parties are in agreement as to her correct name.

3

Melby "suggested that 'she could reduce the minimum number of [QSHIP-triggering] credits to one (1) as opposed to five (5) if she so desired.'" Melby did not "provide any documentation to back up this variation with the Code of Massachusetts Regulations."

Also during fall 2003, Stern met with Daniel Maguffin, the University Bursar. According to Stern, he was able to convince Maguffin that he should not have been charged the QSHIP fee. As a result of this meeting, Stern was allowed to remain active and enrolled at the University during fall 2003. Also according to Stern, the QSHIP fee was temporarily credited and removed from his bill.[4]

On December 23, 2003, Stern discussed the QSHIP fee with individuals from the University of Massachusetts Student Legal Services Office ("SLSO"). According to Stern, SLSO representatives informed him that he may have a case against the University and its Board of Trustees, but SLSO could not file suit on his behalf because its ability to litigate on behalf of students against the University was terminated after it successfully prosecuted a lawsuit against the Board of Trustees during the 1980's.

Nonetheless, in the winter of 2004, Suman Rastogi, a law clerk at SLSO, conducted an investigation respecting Stern's claims. According to Stern, Rastogi contacted the defendant Division of Health Care Finance and Policy and spoke by telephone with "a Mr. Getachew [Habteh-Yimer]."[5] During their first conversation, on January 29, 2004, Habteh-Yimer allegedly told Rastogi that students who take fewer than nine credits do not need to sign up for QSHIP and

---

[4] At some point, Stern alleges, the QSHIP fee was reinstated on his account.

[5] Materials filed by the Division indicate that the name of the Division employee to whom Stern refers is actually named Getachew Habteh-Yimer. To avoid confusion, the Court will refer to Mr. Habteh-Yimer by his correct name.

4

that he would send her a letter indicating as much.  When she did not receive a letter from

Habteh-Yimer by February 9, 2004, Rastogi again telephoned him.  During this second

conversation, Habteh-Yimer allegedly informed Rastogi that his legal counsel had advised him

"not to give anything in writing," that "the law is clear about part-time students," and that

"students have to resolve this problem with [University] officials."

By letter dated August 23, 2004, Stern was notified that there was an outstanding balance

on his account, including unpaid library fees and a $705 QSHIP fee.  The letter, written by

Elizabeth Reardon, a collections officer for the University, noted that the University could

institute collection action on the outstanding debt but that Stern was entitled to respond to the

matter and explain the debt situation.  Stern contacted Reardon and "explained the situation he

was having with regard to the outstanding amount."  To avoid further penalties and collection

efforts, Reardon placed Stern's account on hold pending resolution of the dispute.

Stern attempted to enroll in two courses at the University for the fall 2004 semester.  He

was not permitted to do so because he was deemed to be "administratively withdrawn" for

nonpayment of the $705 QSHIP fee.  The QSHIP fee for fall 2004, had he been permitted to

enroll, would have been $798.

On September 3, 2004, Stern contacted the interim Bursar of the University, Tom

Mathers, and "explained the situation to him in an effort to maintain an 'active' status on the

University campus."  According to Stern, Mathers attempted to contact defendant Brian Burke,

Associate Counsel for the University.  Mathers also called Melby, who allegedly told Mathers that

Stern should "just pay it" (the fee) and then "seek a refund."  Mathers allegedly agreed that "from

a customer standpoint Stern should not have to pay for an item that is incorrect while waiting for

5

disposition to be properly heard and adjudicated."  Mathers also allegedly contacted his

supervisor, Andrew Mangles, the University Controller, "who felt the situation was 'unique' and

'that Mr. Stern may have stumbled across something which could cost the University thousands

of dollars.'"[6]

### Procedural Background

On September 7, 2004, Stern filed a complaint *pro se* in the United States District Court

for the District of Massachusetts.  He was allowed to proceed *in forma pauperis*.  The complaint

alleges generally that, by imposing the QSHIP fee and preventing SLSO from representing him,

defendants have violated his rights under the United States Constitution, the Massachusetts

Constitution, and various federal and state statutes and regulations.[7]  Stern seeks (1) an injunction

requiring defendants to remove his "administratively withdrawn" status and to permit him to

enroll; (2) an injunction requiring defendants to permit SLSO to represent him; (3) a declaration

that defendants' conduct violates the Massachusetts General Laws, the Massachusetts

Constitution, the United States Constitution, and Title 34 of the Code of Federal Regulations; (4)

a declaration that defendants' refusal to allow SLSO to represent him violates the Massachusetts

Constitution; (5) damages; and (6) attorneys' fees and costs.

---

[6] As discussed below, Stern seeks to amend his complaint to add claims against The Chickering Group and Aetna Life Insurance Company, as well as multiple representatives of those companies' senior management. The connection of Chickering and Aetna to this dispute, if any, is entirely unclear, but it appears that the health insurance at issue may have been provided by Chickering, and that Aetna may have an ownership interest in Chickering.

[7] Stern purports to bring this case as a class action, citing Fed. R. Civ. P. 23(b)(2).  He defines the class as "all past, present and future University of Massachusetts part-time students, that, because of fraudulent and discriminatory activities on the part of Director of Health Services [Bernette] Melby, has sought to over-charge students that classify as part-time students according to the Code of Massachusetts Regulations."  Compl. ¶ 22.

On September 7 and 14, 2004, Stern filed emergency motions seeking injunctive relief permitting him to enroll for the fall 2004 semester. The Court treated the two together as motions for a temporary restraining order and a preliminary injunction.

On September 17, 2004, the Court held a telephonic hearing on the motion for temporary restraining order. The Court denied the motion, concluding that, although Stern had demonstrated a risk of irreparable harm and that the balance of the harms favored him, Stern was unlikely to succeed on the merits of his claim.

On September 23, 2004, the Court held a hearing on the motion for preliminary injunction. After receiving supplemental filings from the parties, the Court denied that motion as well, again concluding that Stern was unlikely to succeed on the merits.

Also on September 23, 2004, Stern filed a motion to amend his complaint. As it was filed before any defendant had filed a responsive pleading, the Court granted that motion on the basis that he was entitled to amend the complaint once as of right pursuant to Fed. R. Civ. P. 15(a).

Subsequently, Stern has filed numerous "exhibits"; a motion for sanctions against defense counsel; a motion to recuse the undersigned District Judge; and a motion to reconsider the Court's order denying the preliminary injunction.[8] He has also filed four new motions to amend the complaint, seeking, among other things, to substitute "Mr. Getachew" as an individual defendant for the Division; to add as parties defendant The Chickering Group, Aetna Life Insurance Company, and various individuals apparently employed by those companies; to add new

---

[8] The Court denied the motion for sanctions because Stern did not comply with the procedures and meet the grounds for sanctions required under Rule 11; denied the motion to recuse because Stern did not demonstrate that the undersigned District Judge's impartiality might reasonably be questioned; and denied the motion for reconsideration because Stern failed to assert or establish cognizable grounds for reconsideration.

allegations of fraud and conspiracy against Chickering and Aetna; and to add new allegations relating to his status as an individual with a disability.

On October 15, 2004, defendants University of Massachusetts, University Health Services, and the University of Massachusetts Board of Trustees (collectively, the "UMass Defendants"), Director of Health Services Melby, and Associate General Counsel Burke moved to dismiss Stern's amended complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). As grounds for dismissal, defendants argue that (1) the university is immune from suit in federal court; (2) Stern has failed to state any federal claim; and (3) in any event, the university's QSHIP policy does not violate state law.

On November 16, 2004, the Massachusetts Board of Higher Education and the Massachusetts Division of Health Care Finance and Policy filed a motion to dismiss under Fed. R. Civ. P. 41(b), arguing that Stern's amended complaint fails to comply with certain pleading rules, specifically, Rules 8(a), 8(e), and 10(b) inasmuch as it is "a 41-page meandering document that is verbose, argumentative, and confusing." In the alternative, the Board and the Division request the Court enter an order directing Stern to file an amended consolidated complaint that conforms with Rules 8(a), 8(e), and 10(b).[9]

---

[9] The currently pending complaint, and thus the operative complaint for purposes of the motions to dismiss, is the amended complaint—that is, the original complaint filed September 7, 2004 (Docket #3), as amended by the motion filed September 23, 2004 (Docket #14). The Rule 41(b) motion to dismiss appears to be directed not at the amended complaint, but rather at the latest proposed iteration of the complaint, the "Consolidated Complaint of All Amendments" filed November 5, 2004 (Docket #42). Because the Court has not granted Stern's motion for leave to file the Consolidated Complaint of All Amendments, the Rule 41(b) motion perhaps should be technically viewed as an opposition to the motion for leave to amend or a conditional motion to dismiss. However, because the Court has determined that the complaint must be dismissed whether or not it is amended, the issue is moot.

On December 1, 2004, Stern filed an objection to the motions to dismiss in which he argues essentially that his *pro se* status precludes dismissal of his complaint. The Board and the Division, in their reply memorandum in support of their motion to dismiss under Rule 41(b), state that the complaint "should also be dismissed as to [them] because of Eleventh Amendment immunity."

## Legal Analysis

### I.     Motions to Dismiss Under Rule 12

The UMass Defendants**,** Melby, and Burke have moved to dismiss the amended complaint under Rules 12(b)(1) and 12(b)(6).[10]  As noted, the Board and the Division have stated in a reply memorandum that they are entitled to Eleventh Amendment immunity. The Court will treat the reply memorandum filed by the Board and the Division as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).

### A.     Standard of Review

Under either Rule 12(b)(1) or 12(b)(6), the Court must accept as true all well-pleaded facts as they appear in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 27 (1st Cir. 1994).  A complaint should not be dismissed for failure to state a claim or for lack of subject-matter jurisdiction unless it is clear that plaintiff will be unable to prove any set of facts that would entitle him to recovery. *Id.* But the Court is not obliged to credit "bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation, nor to honor subjective characterizations,

---

[10] The Court also observes that a *pro se*, *in forma pauperis* complaint is further subject to dismissal by a court *sua sponte* if it is frivolous or malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B).

optimistic predictions, or problematic suppositions." *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992).

As a general rule, a court should give motions to dismiss for lack of subject-matter jurisdiction precedence over motions to dismiss for failure to state a claim. *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 (1st Cir. 2000). Accordingly, the Court will first consider defendants' motions to dismiss under Rule 12(b)(1).

### B.      Eleventh Amendment Immunity

#### 1.      Claims Against State Agencies

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. As interpreted, the Eleventh Amendment also bars suits brought in federal court against a state by its own citizens. *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). Thus, in the absence of consent or abrogation, a federal-court suit in which the state or one of its agencies or departments is the named defendant is proscribed by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).[11]

---

[11] Stern rightly notes that, as a general principle, a state can waive its sovereign immunity and consent to suit in federal court for certain causes of action where Congress has conditioned the acceptance of federal funds on such waiver. *See Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 129 (1st Cir. 2003) (holding that Puerto Rico waived its Eleventh Amendment immunity under Section 504 by applying for and accepting federal funds for certain programs). Stern seeks to amend his complaint to add a claim under Section 504 of the Rehabilitation Act, claiming that, by receiving federal funds, Massachusetts has waived its sovereign immunity from suit under Section 504. The Court will discuss the viability of Stern's proposed Section 504 claim in detail below. For now it is sufficient to state that, even if Massachusetts has waived its immunity from suit in federal court for claims brought under Section 504, any such waiver is limited to Section 504 claims. Significantly, it is not a *general* waiver of immunity for all causes of action, as Stern apparently contends.

Here, Stern has named the Massachusetts Board of Higher Education and the Massachusetts Division of Health Care Finance and Policy as defendants. Both entities are clearly agencies or departments of the Commonwealth. *See* Mass. Gen. Laws ch. 15A (Board of Higher Education); Mass. Gen. Laws ch. 6A, § 16, Mass. Gen. Laws ch. 118G (Division of Health Care Finance and Policy). As there is no indication of consent to suit by the Commonwealth, Stern's claims against those agencies are barred. Therefore, all claims against the Massachusetts Board of Higher Education and the Massachusetts Division of Health Care Finance and Policy are DISMISSED pursuant to Rule 12(b)(1).

### 2.     Claims Against the University

Whether the UMass Defendants can invoke the protection of the Eleventh Amendment is a more complex issue.[12] Most federal courts have permitted state universities to invoke the state's sovereign immunity to prevent litigation in federal court. *See* Erwin Chemerinsky, *Federal Jurisdiction* § 7.4 (3d ed. 1999). The First Circuit, however, has developed a multi-part test for determining whether a state university is an arm of the state. *See University of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200 (1st Cir. 1993) (concluding that the University of Rhode Island is *not* an arm of the state for diversity-of-citizenship purposes). And, while some District Courts have determined that the University of Massachusetts (or the University of Massachusetts

---

[12] Stern has named the University, the University of Massachusetts Health Services, and the University of Massachusetts Board of Trustees as defendants. There is no allegation that the University Health Services is a separate legal entity in any respect. The Board of Trustees appears to have been sued collectively, as an entity, not individually, as trustees; no individual trustee is named, and the complaint does not seek relief against any individual trustee. This Court is aware of no reason to treat the University Health Services or the Board of Trustees separately from the University itself for the purposes of the sovereign immunity issue.

Memorial Medical Center) is an arm of the Commonwealth,[13] the First Circuit appears not to have squarely decided the issue. *See Neo Gen Screening, Inc. v. New Eng. Newborn Screening Program*, 187 F.3d 24, 27 (1st Cir. 1999) (describing as "at least colorable and certainly not plain error" the court's holding that the University enjoys Eleventh Amendment immunity but not deciding the issue because it was conceded for purposes of appeal); *Cantwell v. University of Mass.*, 551 F.2d 879, 880 (1st Cir. 1977) (affirming dismissal of claims against the University on common-law-sovereign-immunity grounds).

In *A.W. Chesterton*, the University of Rhode Island ("URI") contended that it was not a citizen of Rhode Island for diversity-of-citizenship purposes because it is an arm or alter ego of the state, and a state cannot be a citizen of itself for purposes of diversity jurisdiction. 2 F.3d at 1202. The First Circuit ruled that "each state university must be evaluated in light of its unique characteristics," *id.* at 1204, and listed eight nonexhaustive criteria for courts to consider in making the arm-of-the-state determination:

> whether the entity (1) performs an "essential" or "traditional" governmental function, as opposed to a nonessential or merely proprietary one; (2) exercises substantial autonomy over its internal operations; (3) enjoys meaningful access to, and control over, funds not appropriated from the State treasury; (4) possesses the status of a "public corporation"; (5) may sue and be sued in its own name; (6) can enter into contracts in its own name; (7) has been granted a state tax exemption on its property; or (8) has been expressly debarred from incurring debts in the State's name or behalf.

---

[13] *See Orell v. UMass Mem'l Med. Ctr., Inc.*, 203 F. Supp. 2d 52, 60 (D. Mass. 2002) ("UMMC, as a part of the University of Massachusetts, is a public institution established under the laws of the Commonwealth and is, accordingly, an 'arm' of the state entitled to Eleventh Amendment immunity."); *Ali v. University of Mass. Med. Ctr.*, 140 F. Supp. 2d 107, 110 (D. Mass. 2001) (holding that UMMC, as a part of the University of Massachusetts, is an arm of the state and therefore not subject to suit under the MCRA); *Daniel v. American Bd. of Emergency Med.*, 988 F. Supp. 127, 180-81 (W.D.N.Y. 1997) (concluding that the University of Massachusetts Medical Center is entitled to Eleventh Amendment immunity).

*Id.* at 1205 (citing, *inter alia, Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*, 991 F.2d 935, 939-40 (1st Cir. 1993)).

Applying those factors, the court concluded that the Rhode Island Board of Higher Education, the legal entity that acts for URI, "unlike more 'typical' state educational entities," was so operationally and financially autonomous that it was not an arm or alter ego of the state and therefore was a Rhode Island citizen for diversity purposes. *Id.* at 1211. The court noted that the Board enjoyed an "extraordinary measure" of autonomy. *Id.* at 1206. It had pervasive supervisory powers with significant insulation from political pressure. *Id.* at 1208. It had the power to hold, acquire, and dispose of property for URI and to enter into contracts in its own name. *Id.* at 1209. The court also concluded that the Board had significant financial autonomy from the state. *Id.* at 1211. Thus, although it received both appropriated funds and nonappropriated funds (for example, tuition and donations), it had plenary authority to reallocate appropriated funds, and a significant portion of its funds were nonappropriated. *Id.* at 1210.

As noted, *A.W. Chesterton* involved a determination of the "citizenship" of the university for diversity jurisdiction purposes. The court observed that there is "an essential similarity between the [Eleventh Amendment] immunity and diversity tests." 2 F.3d at 1202 n.4. The ultimate question for decision in both contexts is "whether the [state] remains the *real party in interest*, notwithstanding [the state-related entity's] designation as the nominal [party]." *A.W. Chesterton*, 2 F.3d at 1203. But in the immunity context, an additional, primary focus of attention is on "any financial *drain* on the State treasury caused by a judgment" adverse to the state-related entity. *Id.* at 1202 n.4.

Since its decision in *A.W. Chesterton*, the First Circuit has refined the analytical framework for determining whether a public entity created by the state is entitled to Eleventh Amendment immunity. In *Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico & the Caribbean Cardiovascular Center Corp.*, the court set forth a two-pronged test for deciding whether such an entity is an arm of the state. 322 F.3d 56, 68 (1st Cir. 2003), *cert. denied*, 540 U.S. 878 (2003). The first prong asks whether the state has clearly structured the entity to "share its sovereignty." *Id.* The factors set forth in *A.W. Chesterton* and *Metcalf & Eddy* are used to perform this analysis. *See id.* If the factors assessed in evaluating the structure of the state-related entity are inconclusive, then the second prong assesses the risk that damages will be paid from the public treasury. *Fresenius*, 322 F.3d at 68. "This analysis focuses on whether the state has legally or practically indebted itself to pay the entity's indebtedness." *Id.*

Accordingly, the Court must first examine the state statutory scheme, taken as a whole, to determine whether the Commonwealth has structured the University to "share its sovereignty." The Court will also consider how the courts of the Commonwealth have addressed that issue. Although the question of whether the University enjoys Eleventh Amendment immunity is an issue of federal law, *id.* at 61 (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997)), the resolution of that issue depends almost entirely on the structure and purpose of state law, and therefore state law judicial interpretations are entitled to considerable weight in that analysis. *See Redondo Constr. Corp. v. Puerto Rico Highway & Transp. Auth.*, 357 F.3d 124, 128 n.3 (1st Cir. 2004) (state-court determinations as to the intentions of the legislature are "worthy of consideration" in performing the federal-law analysis).

14

Massachusetts General Laws chapter 75 establishes and defines the authority of the University of Massachusetts.  Section 1 provides:

> The state university shall be the University of Massachusetts, . . . which shall continue as a public institution of higher learning within the system of public higher education and shall be governed by the board of trustees established herein.  In addition to the authority, responsibility, powers and duties specifically conferred by this chapter, the board of trustees shall have all authority, responsibility, rights, privileges powers and duties customarily and traditionally exercised by governing boards of institutions of higher learning.  In exercising such authority, responsibility, powers and duties, said board shall not in the management of the affairs of the university be subject to, or superseded by, any other state agency, board, bureau, commission, department, or officer, except as [specifically provided].

Mass. Gen. Laws ch. 75, § 1.  The quoted language clearly gives the University trustees some degree of autonomy in the management of the university's affairs.  This conclusion is further supported by the provisions of Section 3, which state:

> Notwithstanding any other provision of law to the contrary, except as herein provided, the trustees may adopt, amend or repeal such rules and regulations for the government of the university, for the management, control and administration of its affairs, for its faculty, students and employees, and for the regulation of their own body, as they deem necessary. . . .

Mass. Gen. Laws ch. 75, § 3.  The autonomy of the trustees extends not only to academic affairs, but also to certain financial matters.  *See* Mass. Gen. Laws ch. 75, § 2 (granting trustees broad authority over academic matters); Mass. Gen. Laws ch. 75, § 8 (providing that trustees may, at their own discretion, transfer funds among subsidiary budget accounts); Mass. Gen. Laws ch. 75, § 13 (giving the trustees substantial independence in purchasing decisions).

The trustees, however, are by no means free from state supervision and control, beginning with the manner of their appointment.  The governor appoints 17 voting members of the board of trustees to serve five-year, uncompensated terms.[14]  Mass. Gen. Laws ch. 75, § 1A.  The governor's appointment power is an important fact that may indicate an entity's lack of independence from state control, although, fixed terms and minimal compensation tend to suggest the opposite.  *See Fresenius*, 322 F.3d at 68; *A.W. Chesterton*, 2 F.3d at 1208.

Although the trustees can adopt, amend, or repeal rules and regulations for the government of the University, they must comply with certain provisions of the Massachusetts Administrative Procedure Act.  Mass. Gen. Laws ch. 75, § 3.  A requirement that the University comply with the APA is a factor that tends to suggest that the entity is an arm of the state.  *See A.W. Chesterton*, 2 F.3d at 1208.

Operating funds for the University are appropriated by the Massachusetts legislature.  Mass. Gen. Laws ch. 75, § 8.  The trustees must prepare a budget for the university and submit it to the governor.  Mass. Gen. Laws ch. 75, § 7.  And the trustees are limited in their ability to raise nonappropriated funds by the requirement that they submit recommendations for tuition rates to a state agency, the Board of Higher Education, for approval.  Mass. Gen. Laws ch. 75, § 1A.

All University accounts under the direction and control of the trustees are audited annually by the state auditor.  Mass. Gen. Laws ch. 75, § 6.  The trustees must make monthly statements of the receipts and expenditures of the University to the state comptroller, and they must give a complete financial report covering all receipts and expenditures annually to the governor and the legislature.  Mass. Gen. Laws ch. 75, § 10.  This monitoring of appropriated and nonappropriated

---

[14] The other two members of the board are students with one-year terms.  Mass. Gen. Laws ch. 75, § 1A.

funds alike suggests that the University lacks complete "meaningful fiscal autonomy" from the state. *See A.W. Chesterton*, 2 F.3d at 1211.

Other characteristics of the University also indicate that it is structured to be an arm of the Commonwealth. The University serves a core governmental function, to provide public higher education. Mass. Gen. Laws ch. 75, § 1; *see A.W. Chesterton*, 2 F.3d at 1206 ("[I]t may well be that an entity established to conduct a core governmental function is less likely to be vested with meaningful freedom from governance by the State's elected officials."). Chapter 75 does not denominate the University as a public corporation, which also indicates that it lacks a distinct legal existence from the state. *See A.W. Chesterton*, 2 F.3d at 1206-07. University employees are employees of the Commonwealth. Mass. Gen. Laws ch. 75, § 14. And the Commonwealth owns the property occupied or used by the university and managed and administered by the trustees. Mass. Gen. Laws ch. 75, § 12.

Finally, nothing in Chapter 75 suggests that the Commonwealth has disclaimed responsibility from financial liabilities incurred by the University. *See Fresenius*, 322 F.3d at 69. In fact, the opposite is suggested by the fact that the Commonwealth must indemnify trustees against liability arising out of their official duties performed in good faith and without malice. *See* Mass. Gen. Laws ch. 75, § 1A.[15]

From the Court's review of other applicable Massachusetts statutes and regulations, it appears that any money judgment Stern might achieve against the University ultimately would be against the Commonwealth. *See* Mass. Gen. Laws ch. 75, § 1 (defining the University as a

---

[15] As a prerequisite to indemnification, § 1A requires that the defense or settlement of any such claim be made by the Attorney General or his designee. Representation by the Attorney General is an additional indication that an entity is an arm of the state. *See A.W. Chesterton*, 2 F.3d at 1207 n.11.

"public institution of higher learning"); 815 Code of Mass. Regs., § 5.02 (defining agency of Commonwealth to include "institutions of higher education"); 815 Code of Mass. Regs., §§ 5.09, 5.10 (describing process by which judgments against such agencies are processed by the Comptroller of the Commonwealth).  A decision from the Western District of New York similarly concludes that the Commonwealth must "pay the university's legal obligations and debts." *Daniel*, 988 F. Supp. at 180.

Finally, and significantly, the courts of Massachusetts have consistently treated the University as an arm of the state.  *See, e.g.*, *Wong v. University of Mass.*, 438 Mass. 29 (2002); *McNamara v. Honeyman*, 406 Mass. 43 (1989); *Hannigan v. New Gamma-Delta Chapter of Kappa Sigma Fraternity, Inc.*, 367 Mass. 658 (1975); *Opinion of the Justices to the Governor*, 363 Mass. 889 (1973); *Robinson v. Comm.*, 32 Mass. App. Ct. 6 (1992).

Particularly instructive is *Opinion of the Justices*, where the Supreme Judicial Court concluded that the Commonwealth was legally obligated to pay rent in accordance with a lease executed on behalf of the trustees without the approval of the State Superintendent of Buildings or other state officials.  363 Mass. at 889-90, 897.

*Robinson* is also persuasive.  There, the Massachusetts Appeals Court ruled that the University was "an agency not within the executive office," as opposed to "any other public employer," under the then-applicable version of the Massachusetts Tort Claims Act, such that presentment of the claim to the Attorney General was required.  32 Mass. App. Ct. at 9.  The court analyzed the University's function, its significant connections to the Commonwealth, and the fulfillment of the purposes of the presentment requirement, and held:

> Accordingly, we conclude that the University of Massachusetts is
> an agency of the Commonwealth under G.L. c. 258.  Our

> conclusion is buttressed by the Supreme Judicial Court's statement
> by way of dictum, in *McNamara v. Honeyman*, 406 Mass. 43, 47
> (1989), that the University of Massachusetts is an agency of the
> Commonwealth.

32 Mass. App. Ct. at 9 (internal citation omitted).

The Court gives particular weight to the conclusions of the Massachusetts courts, whose role is to determine and interpret Massachusetts law. Furthermore, every federal court of which this Court is aware likewise has concluded that the University is entitled to Eleventh Amendment immunity. *See Orell,* 203 F. Supp. 2d at 60; *Ali*, 140 F. Supp. 2d at 110; *Daniel*, 988 F. Supp. at 180-81.

The Court accordingly concludes that the University of Massachusetts is an arm of the Commonwealth, structured to share the Commonwealth's sovereignty. The statutory scheme reveals a legislative intent to cede a degree of administrative autonomy to the trustees without also relinquishing financial responsibility for the University. Therefore, the first prong of the *Fresenius* standard is satisfied. It is also clear, although the Court need not reach the issue, that there is a substantial probability that the Commonwealth would pay any damages from the public treasury. Consequently, all of Stern's claims in the amended complaint against the University of Massachusetts at Amherst, University of Massachusetts Health Services, and the University of Massachusetts Board of Trustees are barred by reason of sovereign immunity, and are DISMISSED pursuant to Rule 12(b)(1).

### 3.    Supplemental State Claims

At the heart of this dispute is Stern's contention that the University's QSHIP policy violates Mass. Gen. Laws ch. 15A, §18. Having concluded that the University is an arm of the state, this Court, by operation of the Eleventh Amendment, lacks the power to force the

19

University or its officials to comply with state law. *See Pennhurst*, 465 U.S. at 119, 121 (holding that the Eleventh Amendment "deprives a federal court of power to decide" claims that state officials violated state law in carrying out their official responsibilities, even under pendent jurisdiction). Simply stated, these particular claims cannot be brought in federal court. Accordingly, all of Stern's state-law claims are also DISMISSED for lack of subject-matter jurisdiction.

### 4. Claims Against Melby and Burke

Even though the University itself is immune from suit in federal court, Stern may assert claims against the individually named defendants, Melby and Burke, in their official capacities, for prospective injunctive relief for violations of federal law under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908). *See Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002). Accordingly, the Court will proceed to examine the complaint to determine whether it states any federal claims against the individually named defendants.

### C. Merits of the Federal-Law Claims

Given Stern's status as a *pro se* plaintiff, it is clear that his amended complaint must be liberally construed and should be held to less stringent standards than one prepared by counsel. *Ayala Serrano v. Lebron Gonzalez*, 909 F.2d 8, 15 (1st Cir. 1990). "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled." *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997). Even under this broad view, the only individual defendant against whom the

amended complaint can conceivably be read to allege federal claims is Melby.[16]  The Court is unable to ascertain any allegations in the amended complaint of specific acts by defendant Burke, much less acts that are alleged to have violated federal law.  Accordingly, any claims brought against Burke are DISMISSED.

Read liberally, the amended complaint attempts to state a claim against Melby under 42 U.S.C. § 1983.  The specific allegations against Melby in the amended complaint are that she (1) is responsible for implementing regulations related to student health insurance; (2) said she could reduce the number of QSHIP-triggering credits to one if she chose; (3) did not provide legal authority for that contention; (4) said Stern should pay the QSHIP fee and then seek a refund; and (5) did not take certain remedial action regarding the alleged overcharging of part-time students enrolled in between five and eight credits.  Stern also alleges that he is an individual with a disability who receives funding from the Massachusetts Rehabilitation Commission.  The Court will assume for present purposes, although the amended complaint does not so allege, that Melby was aware of Stern's disability and funding source when she committed the specific acts listed above.

Two allegations are required to state a cause of action under § 1983: the complaint must allege that (1) some person has deprived the plaintiff of a right secured by the Constitution or laws of the United States; and (2) the person who has deprived plaintiff of that right acted under color of state law.  There seems to be no question that Melby operates under color of state law as

---

[16] The amended complaint could also be read to raise a federal right-to-counsel claim against individual trustees based on their alleged refusal to allow SLSO to represent him in this litigation.  Because all claims against the trustees will be dismissed on Eleventh Amendment grounds, the Court will not consider the merits of any such right-to-counsel claim.  The Court notes, however, that in *Student Government Ass'n v. Board of Trustees of the University of Massachusetts*, 868 F.2d 473 (1st Cir. 1989), the First Circuit upheld the very policy Stern apparently challenges here.

the Director of Health Services for the University.  As to the first required allegation, however, Stern has failed to state a cognizable federal claim.

Stern apparently claims that Melby has deprived him of the federal constitutional guarantees of equal protection and substantive due process by requiring him to pay the QSHIP fee.  Stern has by no means precisely articulated the contours of those claims.  At bottom, however, is the allegation that Melby violates state law by requiring him to pay the QSHIP fee, and Stern apparently claims that this alleged state-law violation raises federal constitutional concerns.  This attempt to dress a state-law claim in federal constitutional clothes fails for the reasons that follow.

First, a state actor's "[m]ere violation of state statutory requirements does not offend federal constitutional due process."  *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 20 n.11 (1st Cir. 1994) (quoting *Boston Envtl. Sanitation Inspectors Ass'n v. City of Boston*, 794 F.2d 12, 13 (1st Cir. 1986)).  Therefore, even assuming Melby is violating state law, the amended complaint does not state a § 1983 claim against her for a substantive-due-process violation.

Second, the amended complaint could be read to allege that Melby's implementation of the QSHIP policy infringed Stern's right to equal protection of the laws because it burdens his "right to education."  There is not, however, a general federal constitutional right to education, and Stern cannot state an equal-protection claim on those grounds.  *See Rodriguez v. San Antonio Sch. Dist.*, 411 U.S. 1, 35 (1973).

Nor has Stern stated a selective-enforcement equal-protection claim.  That variety of equal-protection claim requires that the complaint allege that (1) the plaintiff, compared with others similarly situated, was selectively treated; and (2) such selective treatment was based on

impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Yerardi's Moody St. Rest. & Lounge, Inc. v. Board of Selectmen of Randolph*, 878 F.2d 16, 21 (1st Cir. 1989).

The amended complaint does not allege that Stern is required to pay the QSHIP fee when others similarly situated – i.e., other part-time students enrolled in five to eight credits – are not. As explained, the amended complaint alleges precisely the opposite: *all* such part-time students are required to pay the QSHIP fee. Accordingly, Stern has not stated an equal-protection claim based on selective enforcement.

Nor does it follow that requiring Stern to pay the QSHIP fee violates his equal-protection rights. To prove an equal-protection claim, a plaintiff must demonstrate that the defendant acted with discriminatory intent or purpose. *See Washington v. Davis*, 426 U.S. 229, 239-42 (1976). This requirement "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, *not in spite of*, its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added).

In this case, Stern has not pleaded, directly or implicitly, that Melby discriminated against him *because of* his disability in imposing the QSHIP fee. At most, Stern has alleged that Melby continues to insist that he pay the QSHIP fee *despite* his disability. Although federal law in certain circumstances might protect Stern from being treated differently from non-disabled students because of his disability, Stern has provided the Court with no authority that suggests that his disabled status exempts him from paying a fee the University requires of all students taking an identical course load. *See Lee*, 23 F.3d at 21 (upholding a similar University of Rhode

23

Island insurance program against a gender-based equal-protection challenge where appellants failed to allege that URI imposed the "unitary scheme" with any discriminatory animus aimed at male students).

For the reasons above, Stern has not alleged facts sufficient to state a cause of action against Melby under § 1983.  Accordingly, all remaining claims in the amended complaint brought against Melby are DISMISSED under Rule 12(b)(6).

## III.    **Motions to Amend**

There remains the issue of Stern's four pending motions, all of which seek in some form to amend the complaint to add new arguments or new defendants.  Stern essentially seeks leave to make three sets of changes: (1) to add "Mr. Getachew" (presumably, Getachew Habteh-Yimer) of the Massachusetts Division of Health Care Finance and Policy as an individual defendant; (2) to add The Chickering Group, Aetna Life Insurance Company, and various individuals apparently employed by those companies as defendants and to add new allegations of fraud and conspiracy against those defendants; and (3) to add new allegations relating to his status as an individual with a disability.[17]

The proposed amended complaints suffer from a number of pleading deficiencies.  For example, none of the proposed amendments contains a "short and plain statement of the claim" asserted by plaintiff within the meaning of Rule 8(a).  Instead, each proposed amended complaint contains a confusing mixture of legal argument and factual allegations, many of them wholly conclusory in nature.

---

[17] He also makes more specific allegations about Melby, but none of them contain facts that would affect the Court's conclusions regarding the viability of his claims against her as set forth above.

Furthermore, and more fatally, none states a claim upon which relief can be granted within the meaning of Rule 12(b)(6), even construing the allegations in the broadest possible light. As such, allowing Stern to further amend the amended complaint would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (observing that leave to amend may be denied when amendment would be futile).

### A.    Substitution of Mr. Habteh-Yimer as Defendant

Presumably to avoid the consequences of the Eleventh Amendment, Stern seeks through his proposed amended complaints to substitute Getachew Habteh-Yimer as a defendant for the Division of Health Care Finance and Policy. This amendment would be futile because none of the proposed amended complaints states a federal cause of action against Habteh-Yimer.

The specific allegations against Habteh-Yimer are that he (1) responded to telephone calls placed by SLSO law clerk Rastogi on behalf of Stern; (2) originally told Rastogi that students who take fewer than nine credits do not need to sign up for QSHIP and that he would send her a letter indicating as much; (3) never sent the promised letter; and (4) later informed Rastogi that his legal counsel had advised him "not to give anything in writing," that "the law is clear about part-time students," and that "students have to resolve this problem with [University] officials." In conclusory fashion, Stern alleges that, by this conduct, Habteh-Yimer "did deny plaintiff equal access and due process of law."

Stern provides no explanation of how Habteh-Yimer's conduct violated his federal rights or, for that matter, how Habteh-Yimer could provide him any relief. The Court is unable on this record to fill in the missing pieces. As the proposed amendment would not survive a motion to dismiss under Rule 12(b)(6), the amendment would be futile and the motion is DENIED.

**B.     Addition of Chickering and Aetna**

Stern also seeks to amend his complaint to add The Chickering Group, Aetna Life

Insurance Company, and various officers or employees of both companies as defendants.  Stern

makes very few specific factual allegations against any of these companies or individuals.  Instead,

he quotes lengthy passages allegedly taken from Aetna's SEC filings and other websites, and

asserts his suspicion that these putative defendants may have conspired to defraud "the class

members and citizens of the Commonwealth of Massachusetts by means of forcibly charging for

health insurance premiums under a student health insurance program" that violates state law.  He

also alleges, without explanation, that the putative defendants have violated RICO and ERISA**,**

and he asks the Court to enlist the United States Attorney's Office to investigate.

These conclusory allegations are unsupported by any facts and are in the nature of the

"bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright

vituperation, . . . subjective characterizations, optimistic predictions, or problematic suppositions"

that the Court is not required to credit.  *See AVX Corp.*, 962 F.2d at 115.  They would not

survive a motion to dismiss, and, therefore, amendment of the complaint to add such claims would

be futile.[18]

**C.     Addition of New Disability-Related Allegations**

Finally, Stern attempts to state a claim for disability discrimination based on Section 504

of the Rehabilitation Act of 1973, 42 U.S.C. § 794(a).  Specifically, Stern claims that his Section

504 claim is not barred by the Eleventh Amendment because Congress validly conditioned receipt

---

[18] In addition, Stern has not complied with Local Rule 15.1(B) of the United States District Court for the District of Massachusetts, which requires a party seeking to amend a pleading to add a new party to serve the motion to amend on the proposed new party before of filing the motion and to certify such advance service to the court.

of relevant federal financial assistance on a waiver of states' immunity from private suits under Section 504. The Court need not decide, however, whether Massachusetts has waived its immunity under Section 504, because the allegations in the proposed amended complaint do not state a claim under the statute.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a cause of action under Section 504 Stern must allege that: (1) he is disabled; (2) he was excluded from participation in a program by a federally funded entity; (3) he was otherwise qualified to participate in that program; (4) he was excluded from that program solely by reason of his disability. *See Lesley v. Hee Man Chie*, 250 F.3d 47, 52-53 (1st Cir 2001).

Without commenting on the other elements, it is clear that Stern has not alleged facts sufficient to establish the fourth element. Stern alleges that he was "administratively withdrawn" from the University, but he does not maintain that he was withdrawn solely by reason of his disability. Rather, he alleges that he was withdrawn because he refused to pay the QSHIP fee, a fee that the University charges to disabled and non-disabled students alike. That allegation simply does not state a claim under Section 504.

Stern also attempts to add claims based on 42 U.S.C. §§ 1980, 1981, 1982, 1985, 1986, and 1988.[19] Sections 1981 and 1982 prohibit race-based discrimination. Section 1985 and 1986 deal with conspiracies to violate federal rights motivated by discriminatory animus. Section 1988

---

[19] There is no 42 U.S.C. § 1980; that section has been reserved for future legislation.

does not provide a separate cause of action.  None of these provisions is relevant to the factual allegations contained in the proposed amended complaints, and the addition of any claims purporting to be brought under those statutes would be futile.

Moreover, the Court observes that the original complaint contained a passing reference to Stern's funding source (the Massachusetts Rehabilitation Commission, allegedly a federally-funded agency) but no explicit or implicit allegations of disability discrimination.  It was not until after the preliminary-injunction hearing, where the Court probed the nature of Stern's federal claims, including the relevance of his disability to his dispute with the University, that Stern first began to couch his claims in disability-discrimination terms.  The Court may deny a motion to amend when the additional allegations could be viewed as an obvious attempt to avoid an unfavorable ruling.  *See Cobb v. Supreme Judicial Court of Mass.*, 334 F. Supp 2d 60, 62 (D. Mass. 2004) ("There is no good cause for [the motion to amend]. . . . [I]t is an obvious effort to respond to issues raised at the . . . hearing and to avert the dismissal of the case that the court stated was likely to be forthcoming.").  At the hearing, the Court indicated that it would likely conclude that the complaint did not state a federal claim, and, therefore, the other claims would be barred by the Eleventh Amendment.  Under the circumstances, the proposed amended complaints may be seen as last-ditch attempts to avoid the Court's predicted unfavorable ruling.

Accordingly, for the reasons stated above, the Court will DENY all four pending motions that are in name or substance motions to amend the complaint, on the grounds that the proposed amendment would be futile.

Fed. R. Civ. P. 15(a) provides that leave to amend "shall be freely given when justice so requires."  Under other circumstances, the Court might be inclined to grant Stern, as a *pro se*

plaintiff, one last opportunity to construct a complaint that complies with the rules and makes out a federal claim for relief. The Court is nonetheless disinclined to do so under the circumstances of this case.

After a TRO hearing, a preliminary injunction hearing, and multiple layers of briefing and motion practice, the factual and legal basis of Stern's complaint is abundantly clear. His complaint is that the University of Massachusetts charged him a QSHIP fee in violation (he contends) of Mass. Gen. Laws ch. 15A, § 18. He has articulated that complaint in multiple ways, and against multiple parties, but the essence of the complaint is always the same. This is not, therefore, a case where a *pro se* plaintiff has suffered an injury and is having difficulty identifying an appropriate theory of relief. Stern's claim is clear. Nor is this an instance where the plaintiff is wholly uneducated or entirely without access to resources. Stern is obviously intelligent and articulate, and while his pleadings are by no means models of precision, they are well above the norm for a *pro se* litigant. Put simply, Stern's complaint, if it exists, arises under state law, and no amount of amendment can change that fundamental fact. It is therefore appropriate to dismiss this action in its entirety, without another round of attempted amendments.

### Order

For the reasons stated above:

1. The motion to dismiss of defendants University of Massachusetts, University Health Services, the University of Massachusetts Board of Trustees, University Health Services Director Bernette Melby, and Associate Counsel Brian Burke (Docket # 31) is GRANTED;

2.     The motion to dismiss of defendants Massachusetts Board of Higher Education and

       Massachusetts Division of Health Care Finance and Policy (Docket # 43) is GRANTED;

       and

3.     All motions to amend the complaint (Docket #s 19, 20, 33, and 42) are DENIED.


**So Ordered.**

                                        /s/ F. Dennis Saylor
                                        F. Dennis Saylor IV
                                        United States District Judge

Dated: December 23, 2004